**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| MICHAEL PHILIP KAUFMAN |
| Plaintiff, |
| v. |
| SALESFORCE.COM, INC., |
| Defendant. |

Civ. No. 1-20-cv-06879 (JPC)

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT**</u>
<u>**SALESFORCE.COM, INC.'S MOTION TO DISMISS AND TO STRIKE**</u>

**TABLE OF CONTENTS**

I.      LEGAL STANDARD ................................................................................. 1

II.     KAUFMAN'S PATENTS AND THE ALLEGATIONS OF INFRINGEMENT................ 2

III.    ARGUMENT ...................................................................................... 6

    A.  Kaufman Adequately Pleads Induced Infringement ...................................... 6

    B.  Kaufman's '801 Patent Claims Patent-Eligible Subject Matter.................................. 15

    C.  Kaufman Adequately Pleads Direct Infringement of the '801 Patent........................... 22

    D.  Salesforce Fails to Explain how it is Prejudiced by the Complaint's mention of Kaufman's '173 Publication ................................................................. 24

CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*3D Sys., Inc. v. Formlabs, Inc.*, No. 13 Civ. 7973, 2014 WL 1904365
(S.D.N.Y. May 12, 2014) ................................................................14

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ......................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................1

*Automated Transactions, L.L.C. v. First Niagara Fin. Grp., Inc.*,
No. 10-CV-0407 (A) (M), 2010 WL 5819060, (W.D.N.Y. Aug. 31, 2010).....................14

*Bascom Research LLC v. Facebook, Inc.*, No. C 12-6293 SI, 2013 WL 968210
(N.D. Cal. Mar. 12, 2013) ................................................................14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................1

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018)................................19, 21

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018)......................19

*CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 2020 WL 3564691
(Fed. Cir. July 1, 2020)................................................................17, 19

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..............................2

*Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920 (2015)........................8, 10, 12

*Data Scape Ltd. v. W. Digital Techs., Inc.*, 816 F. App'x 461, 2020 WL 3564683
(Fed. Cir. July 1, 2020)................................................................17, 19

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) ......................20, 21

*DSU Med. Corp. v. JMS Co., Ltd.*, 471 F. 3d 1293 (Fed. Cir. 2006) ......................8

*Dynamic Data Techs., LLC v. Amlogic Holdings Ltd.*, 2020 WL 4365809
(D. Del. 2020) ................................................................12, 13

*Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) ..........17, 18, 19, 21

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)................................20, 21, 22

*Finjan, Inc. v. ESET, LLC*, No. 3:17-cv-0183-CAB-(BGS), 2017 U.S. Dist. LEXIS 40784
(S.D. Cal. Mar. 21, 2017) ................................................................14

*Global-Tech Appliances, Inc. v. SEB SA*, 563 US 754 (2011) ................................8

*Google LLC v. Princeps Interface Tech. LLC*, No. 19-CV-06566-EMC, 2020 WL 1478352
(N.D. Cal. Mar. 26, 2020) ................................................................10

*In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323
(Fed. Cir. 2012) ................................................................ *passim*

*Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed.Cir.1993) ................................8

*Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2020 WL 364136
(S.D.N.Y. Jan. 22, 2020)................................................................13

*Labyrinth Optical Tech., LLC v. Fujitsu Am., Inc.,* No. 13-cv-00030
(C.D. Cal. Aug. 21, 2013) ...........................................................................14

*LaserDynamics USA, LLC v. Cinram Grp.,* No. 15-cv-1629, 2015 WL 6657258
(S.D.N.Y. Oct. 30, 2015) ............................................................................11

*Meetrix IP, LLC v. Cisco Sys., Inc.,* No. 1-18-CV-309-LY, 2018 U.S. Dist. LEXIS 225719
(W.D. Tex. Nov. 30, 2018) ..........................................................................14

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005) ...........................9

*Oy Ajat, Ltd. v. Vatech America, Inc.,* No. 10-CV-4875, 2011 WL 1458052
(D.N.J. Apr. 14, 2011) ................................................................................14

*Regents of the Univ. of Minn. v. AT & T Mobility LLC,* 135 F.Supp.3d 1000
(D. Minn. 2015) .........................................................................................13

*Rembrandt Social Media, LP v. Facebook, Inc.,* 950 F.Supp.2d 876
(E.D. Va. 2013) ..................................................................................13, 14

*Sanofi v. Watson Labs., Inc.,* 875 F.3d 636 (Fed. Cir. 2017)...............................................9, 15

*Schindler Elevator Corp. v. Otis Elevator Co.,* No. 09-CV-0560 (DMC),
2010 WL 1032651 (D.N.J. Mar. 16, 2010) ........................................................14

*Script Sec. Solutions, LLC v. Amazon.com, Inc.,* 170 F.Supp.3d 928
(E.D. Tex. 2016)........................................................................................13

*Smart Wearable Techs. Inc. v. Fitbit, Inc.,* 274 F. Supp. 3d 371, 375
(W.D. Va. 2017) ........................................................................................13

*Smartwater, Ltd. v. Applied DNA Sciences, Inc.,* No. 12- CV-5731 (JS) (AKT), 2013 WL
5440599 (E.D.N.Y. Sept. 27, 2013)..................................................................14

*SoftView LLC v. Apple Inc.,* Civ. Act. No. 10-389-LPS, 2012 WL 3061027
(D. Del. July 26, 2012) ...............................................................................14

*Walker Digital, LLC v. Facebook, Inc.,* 852 F. Supp. 2d 559 (D. Del. 2012) .........................13

*Zond, Inc. v. Fujitsu Semiconductor Ltd.,* 990 F. Supp. 2d 50 (D. Mass. 2014).....................14

**Statutes**

35 U.S.C. § 101 ...............................................................................................20

35 U.S.C. § 112 .................................................................................................2

35 U.S.C. § 154 ..............................................................................................2, 24

35 U.S.C. § 271 .............................................................................................6, 7, 8

35 U.S.C. § 287 ...............................................................................................12

Pub. L. No. 112-29, 125 Stat. 284 (2011) ..............................................................2

Plaintiff Michael Philip Kaufman ("Plaintiff" or "Kaufman") submits this memorandum opposing the motion to dismiss and to strike filed by defendant salesforce.com, inc. ("Defendant" or "Salesforce"). D.I. 31-33.

Salesforce's present motion would not be dispositive as to this entire case. Rather, the motion is on four limited grounds: (i) the sufficiency of Kaufman's pleading of *induced* infringement, (ii) the claimed lack of patent-eligible subject matter in *one of the two* patents currently asserted in this case, (iii) the sufficiency of the pleading of *direct* infringement for the same patent (again, only one of the two patents) and (iv) whether references in the complaint to an additional published but as yet unissued Kaufman patent, which the complaint makes clear is not presently being asserted, should be stricken. For the reasons set forth herein, Kaufman respectfully submits that Salesforce's motion should be denied.

## I.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough factual matter," that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

However, a plaintiff is not required "to prove he is entitled to relief at the pleading stage." *In re Bill of Lading Transmission and Processing Sys. Patent Litig.*, 681 F.3d 1323, 1342 (Fed. Cir. 2012). At the pleading stage, a plaintiff is only required to plead enough facts to enable a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As Salesforce notes, reciting a bare legal conclusion of liability, merely naming the elements without more, cannot be taken as constituting the requisite "factual matter" to support a pleading against dismissal. But the term "conclusory" is a characterization that must be carefully applied. Facts sufficient to support plausible inferences rise above the level of mere legal

conclusions. The facts shown must make the inference more than merely consistent with liability, and more than a "sheer possibility." *Id.* at 678. But neither must the factual support rise to the level of probability. *Id.*

Furthermore, in resolving a motion to dismiss, all factual allegations must be accepted as true and all reasonable inferences must be drawn in favor of the non-moving party. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

## II. KAUFMAN'S PATENTS AND THE ALLEGATIONS OF INFRINGEMENT

Kaufman's currently asserted patents are U.S. Patent Nos. 7,886,981, D.I. 1-1 (the "'981 patent") and 10,025,801, D.I. 1-2 (the "'801 patent").[1] The '801 patent derives from the '981 patent (in what is called a "continuation" patent); the two patents are essentially identical in their disclosures (same written description and drawings).[2] The two patents differ primarily in the claims found at the end of the two respective documents.[3]

---

[1] As addressed in Salesforce's motion to strike, the complaint also identifies a published patent application that is pending, referred to as the "'173 Publication." However, as made clear in the complaint itself, the patent applied for in the published application had not yet issued, and Kaufman is claiming only "provisional rights" under 35 U.S.C. § 154(d) with respect to the publication. Such rights are subject to a condition subsequent. The complaint is clear on its face that Salesforce will only be liable with respect thereto "when a patent issues," and that in such event, the then issued patent will be added "by amendment." D.I. 1, Complaint (hereinafter "Compl.") ¶¶ 9, 16, 25, 39.

[2] The Court will note that the '981 and '801 patent documents are physically of different lengths. The difference is primarily due to the fact that the implementing software code for the patent is set forth in full in the body of the '981 patent and occupies 350 columns (175 pages) therein, whereas the same code is instead incorporated by reference by way of a few lines in the subsequent '801 patent (*see* '981 patent, col 29-376; '801 patent, 2:6-12).

[3] "The specification [written description portion of the patent document] shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, second paragraph (in the "pre-AIA" statutory version applicable to patents filed before September 16, 2012, the relevant effective date of the America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)).

A problem of long standing in the software field has been the tedious task of writing application programs (e.g., "apps") to work with data stored in relational databases.

Relational databases typically comprise numerous tables of data in any number of forms and sizes, where the data in the respective tables may relate to data in other tables according to specified rules. The data in the respective tables could be for parts, people, business units, papers, transactions, measurements – virtually anything. The inter-table relationships are typically (i) cross references (*e.g.*, in an HR database, associating an employee with the department to which he/she is assigned), or conversely, (ii) to reflect detail (e.g., to identify all of the employees in a particular department). Such inter-table references may be numerous and complex.

Providing an end user with the ability to work with the data in a relational data means providing a software application (a program, also sometimes called an app), which application in turn provides working access to the data. In a database application, the end user will generally need to be able to display data records, create new ones, and edit and/or delete existing items. Moreover, the user will want to see relationships across tables, navigate from one related table to another, and "drill down" to see more detailed information on cross-referenced items. In addition, it is also necessary for such applications to limit data entry to valid items (*e.g.*, not to allow an employee to be assigned to a non-existent department), and prevent changes that corrupt existing inter-table relationships (*i.e.*, preserve "referential integrity").

For decades before Kaufman's invention, software applications as described above were written by hand and specifically designed for the particular database to which the application was directed, a tedious and expensive process. Software engineers had automated parts of the process, for example, with software that generated data entry forms for individual tables. But no

one had solved the problem of automatically creating an entire functional end user application for any arbitrary database that might come along, regardless of its size or complexity, and allowing not just manipulation of individual-table data, but working with the entire database while being able to see, navigate, and manage data relationships, as well as enforcing data integrity throughout the process.

One of the reasons this invention was challenging is that the prevailing development model was to hard-code a database application in advance, which required all display procedures to already know, and indeed be hand-tailored to, the structure of every table and its relationships. Kaufman's invention starts from the premise that the program would *not* necessarily know the database structure in advance, thus requiring a completely different process to create the application. Kaufman's new process involves the automated scanning of the database structure, and the generation and stream output steps claimed in the '981 patent. The output stream provides the end user with a full-featured application automatically adapted to the database that the program was handed.

Kaufman's '801 patent, the one whose validity is specifically challenged in the present motion, concerns a particular part of the solution addressed by the '981 patent. One of the features of the generated end user interface claimed in the '981 patent is how to "represent" data within a table that a user is looking at (a "primary" table), which is involved in a relationship with another, off-screen table (a "foreign" table), in a manner that presents more descriptive information to the user than the cryptic cross-references that would otherwise be shown. The claims of the '801 patent address how this particular feature is implemented. For example, an employee, Samuel L. Fischer, may belong to the Accounting Department. In the database, all Departments (in a Department table) will typically be keyed by a number, wherein Accounting

may be (for example) Department 116. The Department table might have fields indicating, for each Department, its ID (116 in the case of Accounting), its name (Accounting), a unique abbreviation (ACTG), its Department Chair, main building, administrative contact person, and so forth. In a conventional approach, an automated process for rendering a row (*i.e.*, a record or entry) in the primary (Employee) table would simply display the data encountered when the rendition reached a foreign key reference in the primary table. In this example, a conventional automated solution would show Mr. Fischer in Department 116.

Kaufman's solution does not do this. Instead, when rendering the primary table, Kaufman's software is on the lookout for foreign keys. Instead of rendering the foreign key as it finds it in the primary table, the software follows the foreign key's reference to the foreign table, into the database's *definition* of the foreign table, and then applies one or more of a set of defined technical tests ('801 patent, 36:20-53 (claim 1))[4] to the information in that definition in order to identify the location of *descriptive information* that exists within the foreign table, which the software determines (in accordance with the selected identified tests) will serve better than the raw key value itself, for purposes of providing a more intelligible display to the user. When run, the application so generated will pull the alternative descriptive data from the part(s) of the foreign table that have been so identified, in order to enhance the display of the cross-reference

_____

[4] The patent claim involves making the selection of source(s) for a replacement description (*i.e.*, from which other column(s) in the foreign table to derive the description) based on at least one of the following characteristics of the foreign table column(s): column name, column datatype (e.g., text, date, integer, etc.), at least one column constraint (such as a constraint that the contents cannot be NULL, that they must be unique, etc.), or the column's position within the foreign table. What these tests have in common is that they all may be indicators of a column that contains useful descriptive information. For one example, per this claim, the algorithm might choose to derive the displayed description for a foreign key from the first column encountered in the referenced foreign-table entry (row) that is to the right of the primary key column, of the datatype text, and constrained to be not NULL.

in the primary table. In the case of the example given above, this process would apply the rules specified in the patent claim to figure out where to look in the foreign table to pull out and substitute the string "Accounting" or perhaps "ACCTG" in place of 116, within displays of the primary table.

Salesforce is alleged to infringe both the '981 and '801 patents. Salesforce's user data is organized, on Salesforce's systems, in relational databases. Compl. ¶ 11. However, Salesforce's database structures are not fixed. Salesforce allows its users to modify the structures, for example by adding new columns to tables (e.g., Department Co-chair), define entirely new tables, and alter or add inter-table relationships. Compl. ¶ 13. When the user does this, the end-user displays generated by Salesforce's system immediately reflect the user changes, showing that they are being generated automatically. *Id.* The displays have all of the capabilities for data manipulation (Create, Retrieve, Update, and Delete, also known as "CRUD"), and all of the inter-table capabilities (represent, navigate, manage data across tables, and maintain referential integrity) claimed in the '981 patent. Compl. ¶¶ 14, 19-20; '981 patent, *e.g.*, claim 1, 377:2-38. Furthermore, in displaying related data, the display of the primary table (which again is being automatically generated by Salesforce's software) supplants foreign keys that would have been displayed in primary tables with different, more human-friendly values, as claimed in the '801 patent. Compl. ¶ 27.

## III. ARGUMENT

### A. Kaufman Adequately Pleads Induced Infringement

The complaint charges Salesforce with both "direct" infringement under 35 U.S.C. § 271(a) and "indirect" infringement (in this case, by *inducing* direct infringement *by others*, *i.e.*, its customers), under 35 U.S.C. § 271(b). Salesforce challenges the sufficiency of the pleading of

induced infringement with respect to both asserted patents (and as addressed later, it also challenges the pleading of direct infringement as to one of the two asserted patents).

The distinction between direct and indirect infringement concerns *who it is* that themselves perform the acts that constitute infringement under 35 U.S.C. § 271(a), those acts being making, using, offering to sell, selling, or importing the patented items ("direct" infringement). The complaint alleges not only that Salesforce *itself* performs acts that constitute direct infringement, but that it also causes *its customers* to act in a way that Salesforce knows and intends will cause the customers to directly infringe Plaintiff's patent, which is separately actionable under 35 U.S.C. § 271(b). Salesforce challenges the sufficiency of the pleading with regard to indirect infringement, for purportedly insufficiently alleging the element of intent incident thereto. To the contrary, however, Kaufman respectfully submits that he has alleged sufficient factual matter that plausibly supports the requisite intent for inducing infringing conduct by Salesforce's customers under § 271(b).

Under the Patent Act, *direct* infringement arises where an accused infringer itself "makes, uses, offers to sell, or sells [the] patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a).

*Indirect* infringement may arise under any of subsections (b), (c), (f), or (g) of § 271. Of these further provisions on indirect infringement, it is subsection § 271(b) in particular, which addresses induced infringement, that is asserted here. That subsection provides in its entirety as follows:

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

35 U.S.C. §271(b).

To plead induced infringement under § 271(b), the plaintiff must make sufficient factual allegations that, if true, plausibly support each of the following:

(i)   An underlying direct infringement, *i.e.*, that there exists at least one person (other than the defendant), who, without authority, makes, uses, offers to sell, sells, or imports the patented invention in the U.S. during the term of the patent. *Bill of Lading*, 681 F.3d at 1332; *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed.Cir.1993).

(ii)  Acts by the accused inducer that at least encourage the acts of the direct infringer referenced in (i). *Bill of Lading*, 681 F.3d at 1339.

(iii) That the accused inducer's acts as in (ii) are done with knowledge of the patent in question. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F. 3d 1293, 1306 (Fed. Cir. 2006).

(iv)  The accused inducer's knowledge that the induced acts constitute patent infringement. *Global-Tech Appliances, Inc. v. SEB SA*, 563 US 754, 766 (2011); *accord Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1927 (2015).

Salesforce does not contest the pleading as to items (i) and (ii).[5]

The complaint alleges at ¶ 16, and Salesforce also acknowledges (D.I. 32 at 4, n.3), that Salesforce received a pre-suit letter (D.I. 1-4). That letter expressly brought Kaufman's asserted patents to Salesforce's attention, reflecting that at least as of such receipt, Salesforce was on notice of the asserted patents (item (iii) above). Salesforce presents no argument to the contrary or as to the sufficiency of the corresponding allegation, Compl. ¶ 16.

Thus, Salesforce's sufficiency challenge focuses particularly on item (iv) above, in particular that, in Salesforce's words:

there must be factual allegations that Salesforce knew what acts by its customers constituted infringement (as well as having the specific intent to encourage such

---

[5] Though undisputed, it is noted by way of further explanation that the customers' alleged direct infringement is based on their "use" of infringing "systems" (essentially machines) made available to them by Salesforce. The asserted patents claim the patented inventions in various forms, including in the form of systems (as well as methods (*i.e.*, processes)). *See* '981 patent, claim 4 (377:46-378:21); '801 patent, claim 5 (36:65-37:32). The alleged direct infringement by the customers is based on their use of systems, made available to them by Salesforce, which are alleged to be within the scope of the patent claims. Compl. ¶¶ 33-34.

infringement) [and that] Plaintiff [must] plead facts to establish either knowledge the induced acts infringe or specific intent to bring about infringement.

D.I. 32 at 4. Salesforce contends that the allegations in this regard are merely conclusory and not factual. *Id.* at 3-4. Respectfully, Salesforce's argument overlooks specific statements in Kaufman's letter, and furthermore confuses merely pleading a legal *conclusion* with pleading facts that support a *plausible inference* as to that conclusion, which is all that the law requires.

The law does not require that a pleading must allege facts amounting to explicit directions to another to infringe an identified patent. Rather, under the Supreme Court's definitive ruling in *Global Tech.*, which addressed a finding of liability at trial, the pertinent factor as to intent is the accused inducer's "knowledge that the induced acts constitute patent infringement," whether as established by direct proof of such knowledge or as may be inferred from facts reflecting "willful blindness." 563 U.S. at 766, 768-69.

The Supreme Court has also held that "active steps … taken to encourage direct infringement, … such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe … ." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005) (internal citations omitted and quotations omitted).[6]

Thus, a sufficient pleading need not aver that the accused inducer is overtly directing people to infringe an identified patent. It is sufficient to plead facts reflecting (a) that some one or more persons are performing acts that constitute direct infringement, (b) the accused inducer has acted to direct or at least to encourage those acts, and (c) (as set forth in *Global Tech* and

---

[6] *MGM v. Grokster* is a Supreme Court decision in a copyright case has also been applied in patent cases concerning indirect infringement. *See., e.g.*, *Global Tech*, 545 U.S. at 936-37; *Sanofi v. Watson Labs., Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017) (*citing Global Tech* and *MGM v. Grokster*).

*Commil*) that the accused inducer knows of the patent and that the acts it is directing or encouraging constitute infringement of the patent (or is willfully blind to that fact). *See also Google LLC v. Princeps Interface Tech. LLC*, No. 19-CV-06566-EMC, 2020 WL 1478352, at *3 (N.D. Cal. Mar. 26, 2020) (*citing Commil*, 135 S. Ct. at 1926 ("[a] defendant can meet the knowledge requirement if it has actual knowledge, *i.e.* both (1) knew of the patent and (2) knew as well that the induced acts constitute patent infringement")).

In fact, Salesforce's brief does not dispute that the foregoing is the proper standard. Indeed, its brief can only be read to *admit* that it is sufficient to allege that "the accused infringer took an affirmative action to encourage infringement with the knowledge that the induced acts constitute patent infringement." D.I. 32 at 6.

Salesforce claims that Kaufman's notices were inadequate, because they were allegedly "conclusory." *Id.* However, while Salesforce spends pages discussing undisputed law, Salesforce says little if anything to address what was actually communicated in Kaufman's notices.

Salesforce's argument that Kaufman's notice letter was conclusory is itself conclusory. Kaufman's pre-suit letters, reproduced in D.I. 1-4, expressly bring the asserted patents to Salesforce's attention by their respective patent numbers, and assert that

> Salesforce's services automatically generate the user interface for user data as recited in Mr. Kaufman's patents, as may be seen, for example, when a user changes the structure of the database and the user-interface features automatically adapt to the change. Mr. Kaufman and we believe the presence of these features, and the overall manner in which Salesforce's cloud applications appear to work, reflect that Salesforce's CRM offerings automatically generate their on-screen UIs in the manner claimed in the '981 patent. …

> The publicly available evidence also reflects that in representing a primary user CRM table related through a foreign key to data in a second user table, Salesforce, to enhance its user interface of the CRM data, replaces the foreign key in the primary table with data from a different column in the second table, thereby also infringing the '801 patent.

The foregoing points out that Salesforce's systems give users the power to change the database structure, and that when they do so, the user interface displays automatically adapt to the changed structure, reflecting that the system is generating the user interface based on analyzing the structure of the database, as claimed in Kaufman's patents. It also points out that an automated process of enhancing a "foreign key" with information derived from other contents of the referenced (foreign) table was also observed, as claimed in Kaufman's '801 patent. This constitutes reasonable notice of how Salesforce's customers directly infringe.

> The letters further state:
>
> Mr. Kaufman's '981 patent, '801 patent, and '173 publication also claim systems configured to carry out the claimed methods, and computer-readable media containing software to perform such methods, *which Salesforce users infringe by using such systems and media. Salesforce, by providing such systems and making such media accessible to its users, thereby acts to induce such infringement by its users* (in addition to its own direct infringement).

*Id.* at 3-4 (emphasis added).[7] The italicized words constitute express specific notice that Salesforce's actions induce the customers' infringement of Kaufman's patents. The letter told Salesforce how its customers are directly infringing Kaufman's patents, *i.e.*, when they use Salesforce's system, and further, how Salesforce's system infringes under the claims of the patents, as well as that Salesforce was inducing this infringement by making the infringing systems available to its customers and encouraging them to use the systems to infringe.

---

[7] *LaserDynamics USA, LLC v. Cinram Grp.*, No. 15-cv-1629, 2015 WL 6657258, at *6 (S.D.N.Y. Oct. 30, 2015), cited by Salesforce (D.I. 32 at 4) in inapposite. The notice letter in *LaserDynamics*, perhaps seeking to avoid providing a basis for the defendant's declaratory judgment action, said only that "Based on publicly available information, we understand that some Cinram DVD movie disks include features recited in the claims of these patents. Based on the presence of these features, we believe that Cinram might be interested in licensing one or more of the LaserDynamics USA patents." Unlike Kaufman's letter, which specifically pointed out the automatic user interface generation observed in Salesforce's product, and the basis on which Kaufman believed they were automatic, LaserDynamics' letter did not give any indication of what the claimed "features" were.

Kaufman respectfully submits that the foregoing is sufficient to have put Salesforce on notice as to the nature of the direct infringement by Salesforce's customers and the nature of Salesforce's inducement of such infringement.

Moreover, by statute, the complaint itself, which was filed after these notice letters, also constitutes notice of infringement. 35 U.S.C. § 287(a). Though, as discussed above, Kaufman's pre-suit notice letters are sufficient in themselves, the complaint herein, which was subsequently filed, further put Salesforce on notice as well. *See* Compl. ¶¶ 16, 19, 32-37. Salesforce seeks to minimize these allegations as "only four paragraphs." D.I. 32 at 3. Salesforce ignores the fact that there are eight paragraphs, one of which, paragraph 19, spans nine full pages, going through each element of claim language and the corresponding evidence in detail, with illustrations.

If Salesforce claims that it doesn't know based on these communications how its systems are alleged to infringe, or that it doesn't know what it is doing to cause its customers to infringe, it is not because the notice letters provide too little information. It is because Salesforce doesn't want to know, which is the essence of willful blindness.[8]

Kaufman asserts as discussed above that its pre-suit notice letters were sufficient to put Salesforce on notice as to Kaufman's patents, as to the nature of the infringement of those patents committed by Salesforce's customers and as to the manner in which Salesforce induced the actions by the customers and knew that those acts would infringe Kaufman's patents. Though such notice is sufficient, Kaufman also points out herein that its complaint performs a similar notice function, going forward. In this regard, Salesforce cites *Dynamic Data Techs., LLC v. Amlogic Holdings Ltd.*, 2020 WL 4365809, *2–*3 (D. Del. 2020), an opinion on a ruling

---

[8] The Supreme Court has ruled that it is also insufficient to claim lack of intent based on the belief that the patent is invalid. *See Commil*, 135 S. Ct. at 1928.

dismissing an induced infringement claim, by the Hon. Colm F. Connolly. Judge Connolly, to support his ruling in *Dynamic Data*, actually cited and purported to rely on a ruling by Judge Alvin K. Hellerstein of this district, in Kaufman's case against Microsoft, *Kaufman v. Microsoft Corp.*, No. 16 CIV. 2880 (AKH), 2020 WL 364136, at *1 (S.D.N.Y. Jan. 22, 2020). Kaufman of course knows Judge Hellerstein's ruling well. Respectfully, Judge Connolly misread (or misapplied) the cited decision by Judge Hellerstein in *Kaufman v. Microsoft*, which was limited to willfulness, and did *not touch on* inducement. Induced infringement was also in the case against Microsoft, and the claim of induced infringement was undisturbed by the cited ruling. Because it is based on an unwarranted reading of the decision on willfulness in *Kaufman v Microsoft*, Judge Connolly's decision in *Dynamic Data* should not be taken as persuasive with respect to induced infringement.

Despite the (non-unanimous) caselaw requiring allegations of pre-suit knowledge of the patent to support a claim for willful infringement, a greater number of courts have held that the notice provided by a complaint is nevertheless sufficient to support a claim for induced infringement, going forward.[9] In *Bill of Lading* the Federal Circuit upheld an induced

---

[9] *Smart Wearable Techs. Inc. v. Fitbit, Inc.*, 274 F. Supp. 3d 371, 375 (W.D. Va. 2017) ("the court is persuaded by the reasoning adopted by the majority of district courts that have ruled that a complaint provides sufficient notice of the existence of a patent to support a claim for indirect infringement occurring after the filing date"); *Script Sec. Solutions, LLC v. Amazon.com, Inc.*, 170 F.Supp.3d 928, 937 (E.D. Tex. 2016) (finding that complaint constituted notice was "in keeping with the decisions of most courts that have considered the issue recently.") (collecting cases); *Rembrandt Social Media, LP v. Facebook, Inc.*, 950 F.Supp.2d 876, 881-82 (E.D. Va. 2013) ("a majority of district courts considering this issue have held that post-suit knowledge (*i.e.*, knowledge provided by the filing of the lawsuit) satisfies the knowledge element for indirect infringement" and "the majority view is the sounder view"); *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012) ("there is no legal impediment to having an indirect infringement cause of action limited to post-litigation conduct."); *Regents of the Univ. of Minn. v. AT & T Mobility LLC*, 135 F.Supp.3d 1000, 1011–12 (D. Minn. 2015) ("the notice pleading requirement for indirect infringement claims is satisfied by the filing of a complaint")

infringement claim based on allegations that the accused inducer "became aware of the '078 patent, at the latest, in March of 2009 when it was served with the complaint." 681 F. 3d at 1345 (emphasis added); *see also Labyrinth Optical Tech., LLC v. Fujitsu Am., Inc.*, No. 13-cv-00030, slip op. at 7-9 (C.D. Cal. Aug. 21, 2013) (reviewing conflicting authority and concluding that *Bill of Lading* "settled the issue" and is "binding authority" for the position that sufficient awareness is provided by a complaint that identifies the patents-in-suit).

Dismissal on such a ground would further be unproductive, in that it is generally also held that an amended complaint may in any case rely on the notice provided in an earlier iteration of the complaint.[10]

---

(collecting cases); *Bascom Research LLC v. Facebook, Inc.*, No. C 12-6293 SI, 2013 WL 968210, at *4 (N.D. Cal. Mar. 12, 2013) ("This Court agrees with the other decisions in this District and holds that knowledge of the patents can be established through the filing of the complaint."); *Finjan, Inc. v. ESET, LLC*, No. 3:17-cv-0183-CAB-(BGS), 2017 U.S. Dist. LEXIS 40784, at *9 (S.D. Cal. Mar. 21, 2017) ("the weight of authority in the Northern District of California … is that knowledge of the patents can be established through the filing"); *Meetrix IP, LLC v. Cisco Sys., Inc.*, No. 1-18-CV-309-LY, 2018 U.S. Dist. LEXIS 225719, at *7 (W.D. Tex. Nov. 30, 2018) (denying defendant's motion to dismiss with respect to post-suit claims of indirect infringement, finding plaintiff sufficiently alleged post-suit knowledge of the asserted patents based on service of the complaint); *Oy Ajat, Ltd. v. Vatech America, Inc*., No. 10-CV-4875, 2011 WL 1458052, at *3 (D.N.J. Apr. 14, 2011) ("Plaintiff may proceed with Plaintiff's claim for induced patent infringement after Plaintiff served Vatech America Inc. with Plaintiff's Complaint."); *Schindler Elevator Corp. v. Otis Elevator Co*., No. 09-CV-0560 (DMC), 2010 WL 1032651 (D.N.J. Mar. 16, 2010) ("official notice" by reason of service was sufficient to support claim for induced infringement); *SoftView LLC v. Apple Inc.*, Civ. Act. No. 10-389-LPS, 2012 WL 3061027, at *7 (D. Del. July 26, 2012) ("an accused infringer is on notice of the patent(s)-in-suit once an initial pleading identifies the patents-in-suit"); *3D Sys., Inc. v. Formlabs, Inc.*, No. 13 Civ. 7973, 2014 WL 1904365 (S.D.N.Y. May 12, 2014); *Smartwater, Ltd. v. Applied DNA Sciences, Inc.*, No. 12- CV-5731 (JS) (AKT), 2013 WL 5440599, at *8 (E.D.N.Y. Sept. 27, 2013); *Automated Transactions, L.L.C. v. First Niagara Fin. Grp., Inc.*, No. 10-CV-0407 (A) (M), 2010 WL 5819060, at *6 (W.D.N.Y. Aug. 31, 2010).

[10] *See, e.g.*, *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 57 (D. Mass. 2014) (even if there were no ground to allege inducement in an initial complaint, nothing would "prevent a plaintiff from filing and then subsequently amending its filing were the defendant to continue to induce others to infringe."); *Rembrandt Social Media, LP v. Facebook, Inc.*, 950 F. Supp. 2d 876, 882 (E.D. Va. 2013) ("The patentee could then file, as here, an amended complaint

Salesforce also claims that the underlying direct infringers are insufficiently identified. Paragraph 33 of the complaint alleges that "[t]here exist numerous persons in the U.S. and in this District ("Salesforce CRM Users") who have used and continue to use the infringing features of the Salesforce CRM as alleged in Counts I and II herein." This is plausible, in that, obviously, each user must use Salesforce's UI in order to use the Salesforce CRM products, and the complaint can only be understood to allege that Salesforce's UI generation process as a whole infringes.

Salesforce complains that by language such as "numerous persons" Kaufman "does not identify any customers that are alleged to infringe." D.I. 32 at 4. This is, of course, immaterial. "To state a claim for indirect infringement … a plaintiff need not identify a specific direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists." *In re Bill of Lading*, 681 F.3d at 1336; *see also Sanofi v. Watson Labs., Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017) (specific intent may be established by circumstantial evidence).

## B. Kaufman's '801 Patent Claims Patent-Eligible Subject Matter

Salesforce's characterization of the '801 patent as being merely "directed to the abstract idea of gathering information from a referenced database and displaying that information to a user" (D.I. 32 at 4), is an over-generalization. It improperly redefines the invention in an abstract manner in order to show that it is abstract.

Kaufman's invention in the '801 patent, as reflected by its claims, is *not* merely for a process of "gathering information from a referenced database and displaying that information to a user." Kaufman is not claiming to have invented merely some form of gathering and displaying information. Indeed, an application that merely gathered and displayed information from a

_____

that alleges indirect infringement with notice of the patent in issue based on the filing of the original complaint.").

database would only result in the *problem* that Kaufman sought to solve with the '801 patent –
the simplistic rendition of table-cross references with their original, cryptic foreign keys, failing
to take advantage of useful data in the related table that could better inform a user in a single
glance as to the true substance of database relationships.

Rather, the claims here are directed at a specific technical process for automatically
*changing* information gathered from a database to *something else*, for purposes of providing a
better display, *e.g.*, in the example above, to automatically determine to change the data "116,"
which conventionally would have been shown in the display of the Employee table (primary
table), to something else more readable, *e.g.*, "Accounting" or "ACTG," drawn from elsewhere
in the cross-referenced table.

To be fair, later in its argument, Salesforce does acknowledge the feature of changing
information in the display (D.I. 32 at 11-12). Significantly, however, while Salesforce notes this
claim language, it fails to distinguish this additional functionality of changing data from merely
displaying gathered information. It also fails to acknowledge the fact that the claims in question
recite not just *that* the data will be changed, but also recite a specific technical process for *how* to
change it. Unlike simply claiming the functional result of an enhanced representation of a foreign
key, the claim actually spells out the computer process steps for making the necessary selection
and modification *to achieve* the desired result.

The cases that Salesforce cites go to the basic process of gathering and displaying
information – the strawman proposition that Salesforce first formulated at page 7 of its brief, or
at most to patent claims that broadly recite *any* selection or modification of data without
addressing how to carry it out, as part of the claim. The authority that Salesforce cites fails to
show *any* case that invalidated a patent in which the claim recited not just selecting or changing

information to be displayed, but a specific technical process for how to make the selection and/or change.

In the first case that Salesforce cites in this regard, *Data Scape Ltd. v. W. Digital Techs., Inc.*, 816 F. App'x 461, 2020 WL 3564683 (Fed. Cir. July 1, 2020) (non-precedential), the claims recited "selective data storage, transfer, and processing," but did not recite any specific technical process for making the selection. The claim in question, reproduced in the opinion, recited only the high-level function of "comparing … management information" in the process of determining files to retrieve, without specifying what management information was being compared, or the criteria or steps involved in making the comparison. *Id.* at *1-2. This differs from the present case, where the claim recites specific technical criteria for finding and identifying an alternate data source in a second data structure. No different is the next cited case, *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 2020 WL 3564691, at *3 (Fed. Cir. July 1, 2020) (non-precedential), which similarly involved claims reciting only collecting, analyzing (by a human), and displaying cardiac data – "not any particular technology for performing these functions." *Id.* None of the other non-precedential or district court cases string-cited in the same paragraph on pages 12-13 of Salesforce's brief are any different in this regard (concerning, *e.g.*, nontechnical subject matter such as ad insertion, self-improvement, meal planning, and the like, far removed from any actual issue in this case).

Salesforce relies particularly on the Federal Circuit's precedential decision in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016), for the proposition that "the combination of th[e] abstract-idea processes … of gathering and analyzing information of a specified content, then displaying the results" is unpatentable subject matter. D.I. 32 at 13. But *Electric Power* follows the same pattern as the other cases cited by Salesforce. The claims in

that case recite analysis in general terms but do not recite *how* the analysis is performed. Moreover, the language of the *Electric Power Group* decision is readily distinguished from the present circumstances. The court in *Electric Power Group* expressly noted that in the case before it, "the claims do not go beyond requiring the collection, analysis, and display of available information in a particular field, *stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology*." *Id.* at 1351 (emphasis added). Later in the opinion, the court observed: "The advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, *and not any particular assertedly inventive technology for performing those functions*. They are therefore directed to an abstract idea." *Id.* at 1354 (emphasis added). Salesforce seeks to apply broad language from the *Electric Power Group* decision without giving any regard to the court's express limitations on the scope of its decision – as if those limitations were not there, or somehow should not count.

Presumably to deal with this shortcoming of its cited authority, Salesforce next argues that the solution claimed in the '801 patent is not really "technical" at all, but merely automates a manual process: "The '801 Patent is not directed to technological improvement, but instead to automating a function that was known to be completed manually." D.I. 32 at 15. This argument is fallacious. The process was previously performed by human intuition on a one-off basis for each specific database for which a human developer was developing an application. The '801 patent, by contrast, reduces the human analysis to a set of specified tests designed to deal with the broad spectrum of any relational database that is likely to be encountered during the life of the software, intended to work against an arbitrary selection of databases not known in advance. The steps are expressed in terms of operations readily performed by a computer: locating the

database definition for the foreign table pointed to by the foreign key; examining in that definition the column names, data types, positions, and constraints to find the best place to retrieve descriptive information, and then deriving a description therefrom to display. These are clearly specific technical steps, not a general direction as in *Data Scape* to perform an unspecified "comparison" or in *CardioNet*, to incorporate a human analysis, or in *Electric Power*, where the claims were not limited to any technical means at all. The claims are not simply a general claim to replicate human judgment. Instead, they specify the steps by which the computer can make the desired determination.

The above-referenced argument in fact boils down to an assertion that the implementation set forth in the claims of the '801 patent is "routine and conventional" under Step 2 of the analysis set forth in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). However, such determinations involve issues of fact and cannot be resolved on the basis of pleadings (or, for that matter, summary judgment). *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-70 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911 (2020).[11]

---

[11] "Step 2" in the *Alice* analysis concerns whether, even if the claims are directed to an ineligible abstract idea, they nevertheless incorporate an inventive concept that makes them something more than the abstract idea. Should the Court reach Step 2, Plaintiff would point to the technical tests in the body of the claim as representing an inventive concept. This is not a case where the patent owner seeks to use the allegedly ineligible overall structure of the claim as a whole to double as the inventive concept under Step 2. *Compare BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1291 (Fed. Cir. 2018). Kaufman's argument here with respect to Step 2 is in accord with the rule set forth in *BSG Tech*, relying on "claim limitations other than the invention's [alleged] use of [an] ineligible concept" (*id.*), in particular the four technical tests in claim 1. Salesforce, which has the burden on this motion, has made no showing that those four tests, based on specified table column characteristics, are routine and conventional methods for identifying descriptive material in a foreign table of a database to enhance the display of records cross-referencing that table.

Finally, Salesforce seeks to distinguish cases that upheld patents under § 101, such as *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) and *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).

*DDR* involved a claim for displaying information responsive to clicking a hyperlink not by navigating to the hyperlinked address, but rather by reproducing the content at the hyperlink address within a framework having the "look and feel" of the referring site and still under the control of the referring site – so as to give users the information they wanted without sending them to a different site. *DDR Holdings*, 773 F.3d at 1248-50. The effect was to composite two web pages in a combined display, rather than simply navigating to the linked web page. *Id.*

There is no principled distinction between the processing describe above, which occurred per the patent claims in *DDR*, in which two web pages were composited, and the processing claimed here, of replacing a portion of a display in a first data table with information pulled from a related, off-screen data table.

The court in *DDR* held such claims patentable because (i) they were "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" (*id.* at 1257), and (ii)

> they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity) … *the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink.* Instead of the computer network operating in its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual "look and feel" elements from the host website. When the limitations of the '399 patent's asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use of the Internet.

*DDR Holdings*, 773 F.3d at 1258-59 (emphasis added).

Salesforce seeks to distinguish *DDR*, but Salesforce's argument actually *acknowledges* – in its own words – that a claim that contains an "unconventional **technical** solution to a [computer] focused problem" (D.I. 32 at 16, emphasis in Salesforce's original) should not be regarded as abstract.

Similarly, Salesforce seeks to distinguish *Enfish*, which upheld a claim to database software that implemented a database in an unconventional manner, and did so using completely standard computer equipment (no different than for a conventional database), on the basis that the database design in *Enfish* was "unconventional" whereas Salesforce would characterize Kaufman's implementation otherwise. *Id.* Salesforce argues here, similarly as it did with regard to *Electric Power*, that "the claims at issue address an age-old problem of presenting user-friendly information, and do so by merely automating a *well-known and conventional* process of displaying data." D.I. 32 at 16 (emphasis added).

But the words "well-known" and "conventional" are mere labels – result-oriented categorizations. Salesforce does not explain how the Court could find, especially at the present stage of the litigation, that the claimed steps by which the '801 patent's process automatically changes the retrieved data by selecting alternate data, and deriving a replacement description from that, is either "well-known" or "conventional." There is no basis in the record for the Court to find the set of specific computer steps claimed by Kaufman to implement the solution in the '801 patent to be either (i) the same criteria as a human would use in any given case, (ii) routine, or (iii) conventional, and moreover any such determination would present factual issues unresolvable on a motion to dismiss. *See Berkheimer*, 881 F.3d at 1368-70.

*Enfish* also recognizes that "claims directed to software, as opposed to hardware" are not "inherently abstract." 822 F.3d at 1335. Such claims may be patent-eligible where, for example, they represent "an improvement to the computer functionality itself." 822 F.3d at 1336. The claim at issue in *Enfish* was for a self-referential database, in which column definitions for multiple tables could be combined into a single table, so that all data values in a database could be stored within a single table-column. *Id.* at 1332. *Enfish* makes a "global search" of a given database more efficient because, with all values stored in one column of one table, only a single query must be constructed and executed, as opposed to requiring a separate query of all value-columns in a given table – which must be tailored to the set of columns in that particular table – and then necessarily repeating such query construction and execution for every separate table.

The '801 patent likewise improves the efficiency of database access. It takes data that by design is separated (or "normalized") into different tables, and makes access to this data more efficient by re-combining data from these separate tables, behind the scenes, into a single composite searchable structure (*i.e.*, selectively *de*-normalizing the data) rather than requiring multiple lookups on separate tables and then requiring the user to correlate these separate results.

### C. Kaufman Adequately Pleads Direct Infringement of the '801 Patent

Salesforce next contends that the complaint inadequately pleads *direct* infringement by Salesforce of the '801 patent. Salesforce asserts that "[t]he Complaint does not include any factual allegations that any Salesforce product actually operates "a first user-level table [that] is related to a second user-level table through foreign key." D.I. 32 at 21. Salesforce then asserts that: "More particularly, the identified image depicts only a single table instead of the two recited tables—'a primary table and a foreign table'— required by independent claims 1 and 5." *Id.*

Paragraph 19 of the complaint shows a table (primary table) of (sales) Opportunities on Page 13. That table has columns that reference, for each listed Opportunity, the corresponding

"Account Name" and "Department." While Salesforce acknowledges that illustration, Salesforce completely overlooks the figures on pages 10-11 of the complaint, which unequivocally show *the two tables*, and that in the example database, "Account" is a foreign table to the Opportunity table, referenced by a foreign key, shown by the blue line in those two figures. The text on page 13 of the complaint specifically explains, with reference to the illustration on that page, that Salesforce's system "replaces actual the foreign key for an Opportunity's Account with the Account name," highlighting the replacement text by circling it in red. These allegations are clearly sufficient to put Salesforce on notice as to the factual basis for this allegation.

Salesforce next complains that the complaint does not explain how Salesforce's system internally selects the displayed descriptive text from the foreign table. D.I. 32 at 21-21. Salesforce claims that it could equally well have "sourced [the circled Edge Communications Account Name] directly from the column named 'Account Name' in the 'Opportunity' table and not derived [it] from a separate 'Accounts' table, which would mean there is no infringement." *Id.* This assertion, however, is contrary to Salesforce's own diagram for these tables at page 10, which clearly shows that the tables are related – *i.e.*, that the reference in the "Opportunity" table is indeed "derived from" the "Accounts" table.

Kaufman is not in a position at this stage to look at the internals of Salesforce's system, and it is not required to have a level of proof today to get to a jury. But what it has pleaded, including the diagrams from Salesforce's systems reproduced on pages 10, 11, and 13 of the complaint, and the accompanying text therein, if (as they must be) taken as true, support a plausible inference that Salesforce infringes the '801 patent.

### D. Salesforce Fails to Explain how it is Prejudiced by the Complaint's mention of Kaufman's '173 Publication

Kaufman has a published, pending patent application in the same family as the '981 and '801 patents, referred to in the complaint as the '173 Publication. The law contains a provision whereby, if the patent later issues as published, Kaufman will be entitled to damages in the future, relating back to the date he gave Salesforce notice of his published patent application, based on its making, using, offering for sale, and selling the invention in the '173 Publication on and after the date of notice. 35 U.S.C. § 154(d). The pleading of Kaufman's published (but as yet unissued) patent application (the '173 Publication) was intended as a backstop to put Salesforce on notice to satisfy the requirements of § 154(d), since it was not clear at the time, due to COVID-19 absences at Salesforce's office, whether Salesforce had received Kaufman's earlier demand letter (which also mentioned the '173 Publication).

The backstop notice provided by the complaint has fulfilled its purpose. Therefore, Kaufman's only opposition to striking this matter is that striking it accomplishes nothing useful in this case. The complaint is clear on its face that, although the acts that would constitute infringement when and if the patent issues in its published form have already occurred, a condition subsequent and future amendment is contemplated, leaving no doubt that there is no separate claim at the time of the complaint, for such infringement. Compl. ¶¶ 9, 16, 25, 39. While Kaufman's mention of the '173 Publication makes no claim for current relief, Salesforce fails to explain how it is prejudiced by this mention in any cognizable manner. None of the authorities that Salesforce cites addresses this issue.

## <u>CONCLUSION</u>

Kaufman respectfully submits that Salesforce's motions to dismiss and strike should be denied.

Dated: November 25, 2020

Respectfully submitted,

/s Ronald Abramson
Ronald Abramson
David G. Liston
Ari J. Jaffess
Alex G. Patchen
M. Michael Lewis
**LISTON ABRAMSON LLP**
*Attorneys for Plaintiff*
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174
(212) 257-1630
docket@listonabramson.com